1
2
3
4                          UNITED STATES DISTRICT COURT
5                         NORTHERN DISTRICT OF CALIFORNIA
6
7    VINCENT SOTO MARQUEZ,
                                              Case No.  13-cv-02525-JD
              Petitioner,
8
9        v.                                   ORDER DENYING PETITION FOR
                                              WRIT OF HABEAS CORPUS AND
10   H. LACKNER,                              DENYING CERTIFICATE OF
                                              APPEALABILITY
              Respondent.
11
12
13        This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.

14   The Court ordered respondent to show cause why the writ should not be granted.  Respondent

15   filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits

16   with the Court.  Petitioner filed a traverse.  The petition is denied.

17                                        BACKGROUND

18        A jury found petitioner guilty of residential burglary and receiving stolen property.  *People*

19   *v. Marquez*, No. H033995, 2012 WL 1200950, at *1 (Cal. Ct. App. April 10, 2012).  It also found

20   that petitioner had three prior strike convictions and five prior felony convictions for which he had

21   served prison terms.  *Id*.  He was sentenced to 44 years to life in state prison.  *Id*.  The California

22   Court of Appeal affirmed the judgment on appeal.  *Id*.  The California Supreme Court denied a

23   petition for review.  Resp. Exs. 12, 13.  Petitioner's habeas petitions to the Santa Cruz County

24   Superior Court, California Court of Appeal, and California Supreme Court were also denied.

25   Resp. Exs. 14, 15; Pet. Exs. U, V, X.

26        The California Court of Appeal summarized the facts of the crime as follows:

27            At around 11:00 a.m., on May 9, 2008, Alejandra Sanchez was
              alone watching TV in the bedroom of her home on Highway 129 in
28            a rural area of Watsonville.  She heard a knock on the front door.

When she looked out a window, she saw a stranger whom she later identified as defendant.  She immediately checked the back door to see that it was locked.  She then peered out a bathroom window and saw defendant and another man and a woman walking down her driveway toward the back of the house.  She later identified the other man as Ruben Tavera and the woman as S.J.  The three people came onto her back deck, and one of the men approached the screen door.  Mrs. Sanchez thought she saw a third man and then heard the noise of someone trying to pry open a window screen in the kitchen.  When she heard the screeching sound of the window being pried open, she fled to the bedroom and locked the door.  She called her husband and then 911.  Before police arrived, someone tried to open her bedroom door, and she heard doors slamming and voices and footsteps inside the house.

About nine minutes after Mrs. Sanchez called 911, Santa Cruz County Deputy Sheriff Brian Erbe arrived at the scene.  He saw two men, whom he later identified as Ruben Tavera and defendant, walking toward him on the driveway and ordered them to stop.  Tavera complied, but defendant fled toward the back of the house and disappeared.  Several seconds later, he reappeared on the other side of the house, ran toward a fence, and tossed something into a field.  Defendant then disappeared behind the house.  At trial, Deputy Erbe was absolutely certain that defendant was the person he had seen flee and toss something into the field.

Around the time defendant disappeared from Deputy Erbe's sight, Officer Brian Fulgoni of the Watsonville Police Department was driving on a dirt road alongside a field behind the house.  He saw a man who matched the description of the fleeing suspect.  He got out of his car, chased after him, and ordered him to stop.  The man, whom he later identified as defendant, complied and was arrested.

Deputy Erbe took custody of defendant and brought him to Mrs. Sanchez, who identified him as the person she had seen knocking on her door.  Later, Tavera and S.J. were brought to her, and she identified them.  In the field where Deputy Erbe had seen defendant toss something, he found 11 pieces of jewelry and a jewelry box.  Marisela Rocha, who lived with Mrs. Sanchez, identified these items as hers and said that she had kept them in her bedroom.

About an hour after the burglary, the police stopped a car near the scene. Tavera's sister was driving it, and S.J. was a passenger.  At trial, S.J. admitted that she knew defendant and Tavera.  She said that they had picked her up that morning, driven to the house, and walked toward it.  However, she said that she was the one who had knocked on the door.  She denied that she entered the house or walked toward the back.  She said that when no one answered the door, she called Tavera's sister, who came and picked her up.  She could not recall what defendant and Tavera did after that, although defendant said he was there to look for a job in the fields.

At trial, to prove intent, the prosecutor introduced evidence that in 1991, defendant was convicted of residential burglary.  Monterey County Deputy Sheriff Roy Martinez testified that on July 8, 1991, he arrived at an apartment building where a burglary was reportedly in progress.  The building was surrounded by a wood fence and abutted land through which ran an irrigation canal.  Deputy Martinez entered one of the units and found a broken window in a back bedroom and glass on the floor.  He saw a man, later identified as defendant, outside the window walking on a levee and carrying a

box. A woman there said that earlier she had seen that man in her apartment. Deputy Martinez pursued and arrested him. The box contained a VCR. Shoe prints outside the broken window matched defendant's shoes, and there was evidence that someone had crawled under a fence surrounding the property.

*Marquez*, 2012 WL 1200950, at *1-2 (footnote omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v.*

1    *Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, in conducting its analysis, the federal

2    court must presume the correctness of the state court's factual findings, and the petitioner bears the

3    burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

4         The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

5    state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

6    1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court to

7    consider the petitioner's claims, the court looks to the last reasoned opinion.  *See Nunnemaker* at

8    801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

9                                        **DISCUSSION**

10        As grounds for federal habeas relief, petitioner asserts that: (1) the removal of Hispanic

11   jurors violated his rights under the Equal Protection Clause; (2) the trial court erroneously

12   admitted evidence of his prior residential burglary; (3) the victim's identification of petitioner was

13   tainted by suggestive remarks by the trial court; (4) the trial court's denial of his motion to

14   substitute counsel led to his request for self-representation, both of which resulted in a violation of

15   his Sixth Amendment rights; (5) his right to due process was violated because the trial judge was

16   not fair and impartial; (6) he did not receive effective assistance of counsel on appeal; and (7)

17   cumulative error.

18   **I.    JURY SELECTION**

19        Petitioner argues that the prosecutor violated his constitutional rights by exercising her

20   peremptory challenges to remove three prospective Hispanic jurors.

21        **Legal Standard**

22        The use of peremptory challenges by either the prosecution or defense to exclude

23   cognizable groups from a jury may violate the Equal Protection Clause.  *See Georgia v.*

24   *McCollum*, 505 U.S. 42, 55-56 (1992).  The Supreme Court has held that the Equal Protection

25   Clause forbids the challenging of potential jurors solely on account of their race.  *See Batson v.*

26   *Kentucky*, 476 U.S. 79, 89 (1986). [1]  *Batson* permits prompt rulings on objections to peremptory

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [1]  The California counterpart to *Batson* is *People v. Wheeler*, 22 Cal. 3d 258 (1978).

challenges under a three-step process:

First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94.

Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).

Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195. To fulfill its duty, "the trial court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003). "As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis . . .," particularly when the state court declined to do so. *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013). Then the court should "reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine." *Id.* at 1225.

In evaluating the race neutrality explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez v. New York*, 500 U.S. 352, 355-62 (1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony). It should also keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. *See Rice v. Collins*, 546 U.S. 333, 340-41 (2006); *Lewis*, 321 F.3d at 830. Because determinations of credibility and demeanor of the prosecutor and jurors lie "peculiarly within [the] trial judge's province," the trial court's ruling on the issue of discriminatory intent is entitled to great deference and must be sustained unless clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 476-82 (2008) (quoting *Wainwright*

5

*v. Witt*, 469 U.S. 412, 428 (1985)); see *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per

curiam) (reversing Ninth Circuit's "inexplicable" and "unexplained" finding that proffered race-

neutral explanations for peremptory strikes were insufficient to outweigh evidence of purposeful

discrimination).

**Background**

The California Court of Appeal set forth the relevant background:

> The prosecutor challenged three prospective jurors with Hispanic surnames: Mr. R., Mr. S., and Ms. G.
>
> 1. Mr. R.
>
> During voir dire, the court explained that a defendant is presumed innocent, does not have to present any evidence, and can simply rely on the prosecutor's failure to prove guilt.  The court asked prospective jurors if they had a problem with that.  Mr. R. initially said, "I think that if he wants to be claimed innocent, he should at least produce something that he's innocent."  Later, however, he said that if the law says a defendant does not have to, then he would not require it.
>
> The court also explained that circumstantial evidence does not directly prove a fact but is an equally reliable method of proof.  As an example, the court stated that if the question is whether a person had been swimming, and a witness testified that he saw the person standing in a dripping wet bathing suit, and wet footprints led from the pool to the person, the testimony would constitute circumstantial evidence that the person had been swimming.  The court asked if jurors could follow instructions about circumstantial evidence.
>
> Mr. R. said, "I think so but I'm still questioning the fact that I-that example you see a guy wet out on a swimming pool; that doesn't imply right there that he was swimming. What if he just came out of the shower or something like that? You know, that's what I was thinking."
>
> Noting this response, the prosecutor asked Mr. R. if he could simply listen to the evidence and refrain from speculating.  He responded, "I think.  I'm naturally curious.  I mean, when something brings, you know, you got to question it, but I think I can manage that."
>
> The prosecutor explained that some questions might not be answered, and although one might be curious, he or she must keep that separate.  Mr. R. thought he could do so.  The prosecutor said now was the time to decide rather than during trial.  Mr. R. said, "[I]t's just like if he says a statement and then you think about it and the question about the-where the crime was committed, I'm also thinking about it right now."  He continued, "It's close. So I don't really know. I can't really answer that right now."  The prosecutor asked Mr. R. where he lived. Mr. R. said he lived on Lincoln where it crosses Riverside Road (Highway 129) in Watsonville.  He said he usually takes walks all the way out Highway 129, but he did not know the specific address where the crime occurred.  Mr. R. had initially said that if he were selected as a juror, he did not know whether he would walk by the scene or be able to set aside his knowledge of the area because "[i]t's pretty curious right now."  However, he later said that he would not go by the scene.

6

### 2. Mr. S.

During voir dire, prospective jurors were asked whether they had had any bad experiences with law enforcement that would affect their view of an officer's credibility at trial. Mr. S. explained, "I've had a bad past history with gangs and drugs. So, I mean, I mean, I'm on the other side of positive thinking now but back in the days I did have a lot of hatred stories with the law." He recognized another deputy district attorney in the courtroom but could not recall whether she had prosecuted him. He reiterated that he had been "really lost in gangs at that time." Now that he had been clean and sober and away from gangs for some time, he could put his previous negative feelings aside.

### 3. Ms. G.

During voir dire, the court asked prospective alternate jurors whether there was any reason they might not be able to be impartial. Ms. G. said that she knew the District Attorney Bob Lee because he had prosecuted her nephew, who had been sent to prison for 15 years. However, she said she would not hold it against the prosecutor in this case. The prosecutor noted that Ms. G. had taken some time to answer whether she would hold against her what her boss, District Attorney Bob Lee, had done to her nephew. Ms. G. responded, "The reason is you base-they sent my nephew for 15 years in prison. They let him out for six months then resend him again for another two years. So I'm against that. You know, why did they send him for another two years when he already paid for 15 years and the judge was ready to let him go, but the District Attorney, that was again not Bob Lee, the one-the defender, he was the one against my nephew. He said need to pay another five years more." She then said she was not "against Bob Lee" and would not hold feelings for or against defendant or the prosecutor.

### C. The *Batson-Wheeler* Motion

After the prosecutor challenged Ms. G., defendant claimed the prosecutor had "systematically removed all Hispanics from the . . . jury."

The court noted that the prosecutor had not challenged Ms. A., a Hispanic woman, who had already been sworn in as a juror. For this reason, the court found that defendant had failed to make a prima facie showing of purposeful discrimination.

Later, because Ms. A. had previously informed the court that she had just been burglarized and could not concentrate or be an effective juror, the court, on its own motion, excused her.

In response and because her use of challenges might end up before an appellate court, the prosecutor volunteered to explain why she had challenged the three Hispanic jurors. She said that Mr. R. lived near the scene of the crime and said he would try not to walk by it. Given his response to the court's circumstantial evidence example, the prosecutor categorized him as a person "who thinks too much." Concerning Mr. S., the prosecutor cited his extensive history with law enforcement and noted that he had tattoos on his hands. She did not believe that he could fairly judge the credibility of law enforcement officers. Concerning Ms. G., the prosecutor noted that she was very close to her nephew who had been imprisoned, and she had attended a hearing only nine months before. The prosecutor felt that she was too close to that proceeding on the side of the criminal defense.

Defendant challenged the prosecutor's reasons. He asserted that Mr.

7

R. lived miles from the scene of the crime. He asserted that Mr. S. did not have an arrest history, and it was common to have tattoos. And as to Ms. G., he noted that she said she considered District Attorney Bob Lee a friend.

The court rejected defendant's arguments. It again found that he had not made a prima facie showing. It also found that the prosecutor had provided valid, neutral, and nondiscriminatory reasons for excluding the three prospective jurors.

*Marquez*, 2012 WL 1200950, at *3-4.

**Analysis**

The California Court of Appeal denied this claim:

Concerning Mr. R., voir dire revealed that he initially thought that a defendant should have to present some evidence to show his innocence. However, if the law did not require it, then he could follow the law. Mr. R. also said that he was naturally curious and questioned things when they are brought up. His response to the court's circumstantial evidence example reflected a tendency to speculate. However, he said that he could manage not to speculate despite his curiosity. Finally, Mr. R. said he lived in Watsonville and took walks out Highway 129. At first, he did not know whether he would visit the scene, but he later said he would not even think of doing so.

Given this voir dire, a prosecutor reasonably could think that Mr. R. might be a potentially problematic juror because he was too imaginative, free-thinking, and curious, and a person whose personal views of the law were not always correct. A prosecutor could further question whether Mr. R., despite his assertions to the contrary, could and would follow instructions that seemed to go against the grain of his own legal instincts, not speculate about missing evidence, and resist his curiosity about the scene of the crime.

Concerning Mr. S., voir dire revealed that he had an extensive history with drugs and gangs, he had tattoos, and he admitted having had "a lot of hatred stories with the law." Notwithstanding Mr. S.'s assertions about being clean, sober, and law-abiding for many years, a prosecutor reasonably could decide against seating any juror with an extensive history of unlawful drug-related activity and gang participation and who had once had strong, negative feelings toward law enforcement.

Concerning Ms. G, voir dire revealed that she was close to her nephew and upset that he had been prosecuted, imprisoned, released, and recently reimprisoned. A prosecutor reasonably could view these circumstances as potent emotional reasons for Ms. G. to harbor anti-prosecutorial and anti-law enforcement feelings. Although Ms. G. said she would not hold what had happened to her nephew against the prosecutor, a prosecutor could question whether she could and would be able to do so and for that reason not want her on the jury.

In sum, the record before us "suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question." Defendant argues that where, as here, a prosecutor excuses all or a significant majority of Hispanic prospective jurors, it is always reasonable to infer an improper group-based purpose and thereby

United States District Court
Northern District of California

8

make a prima facie showing.

However, as noted, a prosecutor's dismissals cannot be viewed in isolation but must be considered in light of the entire voir dire. Thus, in *Hoyos*, *supra*, 41 Cal.4th at pages 901-903, the Supreme Court concluded that the dismissal of all four Hispanic prospective jurors did not constitute a prima facie showing because the record suggested reasonable race-neutral reasons for each dismissal. Similarly, in *Gray*, *supra*, 37 Cal.4th at pages 187-188, the Supreme Court concluded that the dismissal of two of four African-American prospective jurors did not constitute a prima facie showing because the record revealed plausible reasons to remove both jurors.

Here too, voir dire revealed reasonable, neutral grounds to excuse the three Hispanic jurors. Moreover, as the court observed, the prosecutor did not exercise a peremptory challenge to excuse Ms. A., who was also Hispanic. Under the circumstances, we agree with the trial court's conclusion that defendant failed to make a prima facie showing of improper discrimination. FN3

> FN3. Defendant argues that because the court "solicited" the prosecutor's reasons for excusing the three prospective jurors, the issue of whether he satisfied his initial burden of making a prima facie case is now moot. We disagree. The trial court found that defendant had failed to make a prima facie showing. It did not "solicit" the prosecutor's reasons; rather, to make the record complete for purposes of appeal, the prosecutor volunteered her reasons. Thereafter, the court reiterated that defendant had not made a prima facie showing. It then added that the prosecutor's stated reasons were valid.
>
> In any event, the reasons that the prosecutor provided track those which, as discussed above, a prosecutor reasonably and properly could have relied on to dismiss the jurors. Neither defendant's tortured argument that it was not plausible for the prosecutor to think that Mr. R. might visit the scene nor his argument that having tattoos is meaningless convince us that the prosecutor's stated reasons were invalid or that those reasons were a pretext for excusing most of the Hispanic prospective jurors. Moreover, defendant does not argue that the prosecutor's reason for excusing Ms. G. was either invalid or pretextual.

*Marquez*, 2012 WL 1200950, at *5-6 (citations omitted).

While the trial court did not initially find that petitioner had made out a prima facie case of discrimination, the prosecutor still provided race-neutral reasons for dismissing these jurors and the trial court found that the reasons were valid. Augmented Reporter's Transcript ("ART") at 1815. Similarly, the California Court of Appeal found that petitioner had failed to make a prima facie showing of improper discrimination at the first step of the *Batson* analysis, but still noted that the prosecutor's reasons were valid and not pretextual. *Marquez*, 2012 WL 1200950, at *6 n.3. While the trial court and California Court of Appeal only informally reached the third step of the

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1    *Batson* analysis, this Court will look to the third step and conduct a comparative juror analysis and

2    as discussed below it is clear there was no constitutional violation and there were proper race-

3    neutral reasons for excusing these jurors. [2]

4          When the trial court was providing the initial general instructions to the prospective jurors,

5    Mr. R. answered several questions that caused concern regarding his ability to follow court

6    instructions regarding the law.  He initially questioned petitioner's Fifth Amendment protections

7    and suggested that a defendant should produce some evidence and also questioned the trial court's

8    explanation of circumstantial evidence.  ART at 1559, 1588.  Mr. R. was also evasive when he

9    was told that he could not travel to the crime scene, stating, "I don't know.  It's pretty curious

10   right now."  ART at 1602.  While he later stated he would not view the crime scene, all of Mr. R's

11   answers suggested difficulty in following the law and the court's instructions.  The prosecutor

12   presented these arguments to the trial court, and they are race-neutral reasons for dismissing Mr.

13   R.  There is no indication that the prosecutor's answers were pretextual, rather there were concerns

14   about this juror's ability to follow court instructions and the law.

15         Mr. S. stated that he had a prior history with gangs and drugs and at one point had, "a lot of

16   hatred stories with the law."  ART at 1633.  While it is unclear if Mr. S. had a criminal history and

17   whether he had been prosecuted by the same office prosecuting the instant case, he did state that

18   he recognized an assistant district attorney who was in the courtroom, although he could not

19   remember if she had prosecuted him.  ART at 1644.  The prosecutor's exercising of a peremptory

20   challenge against this juror was not a *Batson* violation.  *See*, *e.g.*, *Cook v. LaMarque*, 593 F.3d

21   810, 820-21 (9th Cir. 2010) (prior negative experiences with law enforcement sufficient race-

22   neutral explanation to withstand *Batson* challenge); *Messiah v. Duncan*, 435 F.3d 186, 201 (2d

23   Cir. 2006) (prosecutor could reasonably have believed that juror who had been prosecuted by his

24   office and who had relatives in prison would be unduly sympathetic to defendant and hostile to the

25

26   _____

27         [2] Because the California Court of Appeal used the appropriate standard, the opinion is
     entitled to AEDPA deference.  *See Johnson v. Finn*, 665 F.3d 1063, 1068-69 (9th Cir. 2011).
28   Regardless, petitioner would not be entitled to relief under a lesser standard.

Case 3:13-cv-02525-JD   Document 19   Filed 07/29/15   Page 11 of 26

prosecutor).  As noted in the state court opinion, Ms. G. also had prior negative experiences with law enforcement including the prosecution of her nephew, his fifteen-year prison sentence, and his later re-incarceration.  Dismissing Ms. G. for these reasons was not a constitutional violation.  *See Cook*, 593 F.3d at 820-21; *Messiah*, 435 F.3d at 201.

Reviewing the entirety of the voir dire also demonstrates that the prosecutor excused other jurors, who were not Hispanic, for the same reasons as the above jurors.  Ms. M. was excused and had stated that she had negative experiences with the Santa Clara County District Attorney's Office related to a prosecution of her ex-husband for child molestation.  ART at 1788-89, 1807.  The prosecutor also used a peremptory challenge against Mr. A. who described a wrongful arrest that led to negative experiences with police officers.  ART at 1801-02.  Mr. A. was excused, even though he stated he would follow court instructions regarding the credibility of witnesses.  ART at 1808.  Another non-Hispanic prospective juror, Mr. L., stated he had negative experiences with law enforcement and, with respect to an assistant district attorney who had previously been sitting in the courtroom, "I have never been on trial but the woman who was sitting here with the DA, the only reason I wasn't on a trial because she kicked me off."  ART at 1658, 1662.  This juror was excused.  ART at 1665.

As noted in the state court opinion, the prosecutor did not exercise a peremptory challenge against juror Ms. A., who was Hispanic.  Ms. A. was a nurse for a school district and her husband was a social worker.  ART at 1654.  While Ms. A. was Hispanic, she did not have negative feelings towards law enforcement or relatives who had been prosecuted as was the case with Mr. S. and Ms. G.  Nor did Ms. A. answer any questions that would indicate a possible difficulty in following the law or court instructions, as was the case with Mr. R.

Petitioner has failed to show purposeful discrimination by the prosecutor, and a comparative juror analysis shows that there were sufficient race-neutral reasons for dismissing the three Hispanic jurors and the reasons were not pretextual.  Moreover, the prosecutor did not excuse a fourth Hispanic juror, and while that juror was later excused it was not due to the prosecutor.  For all these reasons, this claim is denied.

## II.    ADMISSION OF EVIDENCE

United States District Court
Northern District of California

Petitioner next contends that the admission of evidence regarding a prior residential burglary violated due process.

**Legal Standard**

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process.  *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991).  Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA.  *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *see, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (because the Supreme Court expressly reserved the question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim did not unreasonably apply clearly established federal law).

**Analysis**

A sheriff's deputy testified regarding petitioner's arrest and conviction related to a 1991

United States District Court
Northern District of California

1    residential burglary.  Petitioner argued on appeal that his prior conviction was too remote and too

2    dissimilar to have any probative value.  *Marquez*, 2012 WL 1200950, at *7.  The California Court

3    of Appeal noted that petitioner was sentenced to 30 years for the 1991 conviction that was later

4    reduced to 25 years.  After his release he was convicted of felonies in 2005 and 2006 and

5    committed the instant offense in 2008.  *Id*.  The California Court of Appeal then set forth the

6    relevant state law and in a lengthy opinion denied the claim finding that the prior conviction was

7    not too remote, there were similarities in the crimes, his intent to commit a crime was at issue, and

8    the evidence was not inflammatory.  *Id*. at 7-10.

9         Petitioner is not entitled to habeas relief because there is no clearly established Supreme

10   Court authority that introducing evidence of prior crimes to show propensity for criminal activity

11   violates due process.  Petitioner can only obtain relief by demonstrating that the admission of the

12   prior crime was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  He has

13   failed to meet this high burden.  The California Court of Appeal noted that the prior conviction

14   was not too remote and that there were many similarities in the crimes.  These were not

15   unreasonable determinations.  Nor did the admission of this evidence render the trial

16   fundamentally unfair.  There was overwhelming evidence implicating petitioner in the crime.  The

17   evidence established that someone had entered the victim's house and taken property.  Petitioner

18   was identified by the victim and by the police officers, arrested near the scene, and observed

19   discarding the property that was taken.  Petitioner is unable to show that the trial was

20   fundamentally unfair as a result of the admission of his prior crime, thus the claim is denied.

21   **III.    IDENTIFICATION**

22        Petitioner next argues that his due process rights were violated and the victim's in-court

23   identification was tainted because the trial court referred to him by name at the start of the victim's

24   testimony.

25        **Legal Standard**

26        A pretrial identification procedure violates due process only when it was "so

27   impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

28   misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).  Evaluating whether a

pretrial identification has been irreparably tainted by a suggestive procedure requires a two-part analysis. *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984) (per curiam). The Court must first determine whether the challenged procedure was impermissibly suggestive. *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972). If not, the Constitution has not been offended. *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985) (as amended) (holding that court "need not reach" question of reliability if challenged procedure not impermissibly suggestive). If the process was impermissibly suggestive, the Court must then examine the totality of circumstances to determine whether the witness's identification was nonetheless reliable. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200. Only if the identification was not reliable must it be excluded from evidence. *See Bagley*, 772 F.2d at 492.

**Analysis**

Petitioner does not allege any violations with the pretrial identification procedure by police. He argues that the trial court inadvertently violated his due process rights when the victim, Mrs. Sanchez, arrived to testify at trial. As noted above, petitioner was representing himself at trial. When the victim arrived in the courtroom, she was called to the witness stand by the prosecutor. Reporter's Transcript ("RT") at 813. The trial court stated to Mrs. Sanchez that the prosecutor, "is going to ask you some questions. Then Mr. Marquez [petitioner] if he has any will have the opportunity to question you as well." RT at 814. Petitioner argues that by identifying him by name, the trial court suggested that he was the perpetrator. Other than stating Mr. Marquez could question her, there is no indication that the trial court identified Mr. Marquez as the perpetrator.

The California Court of Appeal set forth the state law regarding identifications and denied this claim:

> Defendant concedes that the court's comment was inadvertent. Nevertheless, he claims that it undermined his defense, part of

14

United States District Court
Northern District of California

which was that Mrs. Sanchez misidentified him at the scene of the crime.  He argues that by identifying him "by name," the court effectively "informed Sanchez that he was the person on trial who [sic] she previously identified in connection with the incident, so she knew that when asked she should identify him."

. . .

Here, when Mrs. Sanchez was called to the stand, Ms. Dunlap was at her table, and defendant at his.  Although it was unnecessary for the court to refer to defendant by name, it did so only to explain to Mrs. Sanchez what was going to happen and who would be asking her questions.  Nothing the court said suggested that either Ms. Dunlap or defendant would ask her to identify the perpetrator and whether she saw that person in court.  Nor did the court's comment identify defendant as the Mr. Marquez who was on trial for allegedly burglarizing her home.  For all Mrs. Sanchez might have known, the person who might be asking her questions simply shared the same name as the perpetrator.

As a potentially unduly suggestive identification procedure, the court's explanatory comment pales compared with a single-person show up at the scene of a recent crime where the defendant is handcuffed.  And yet even that procedure is not automatically deemed unfair or automatically suggestive. [Citations omitted.]

Finally, even if we considered the court's comment to be unduly suggestive, we would not find a violation of due process.  As noted, defendant must also show that Mrs. Sanchez's later in-court identification was unreliable under the totality of circumstances.

The record reveals that Mrs. Sanchez saw defendant during daylight hours twice at her house from relatively close distances, first knocking at her front door and then later during an in-field identification shortly after he was arrested.  She showed no hesitation in identifying him or the other two persons she had seen with him.  Moreover, it is undisputed that defendant was around her house at the time of the burglary.  These circumstances establish that at trial, Mrs. Sanchez had substantial and reliable grounds to re-identify defendant, and those grounds were wholly independent of the court's brief and unrelated reference to the name of the man sitting at the table. [Citation omitted.]

Defendant argues that the court's suggestive identification was "problematic" because of inconsistencies in Mrs. Sanchez's description of the perpetrator's clothing and the existence of facial hair.  Although such inconsistencies are a factor to consider in determining whether Mrs. Sanchez's in-court identification was unreliable, they are not determinative.  Thus, defendant fails to demonstrate that the court's reference to his name constituted an unduly suggestive identification procedure or that as a result of the court's comment, Mrs. Sanchez's in-court identification was so unreliable as to violate defendant's right to due process.

*Marquez*, 2012 WL 1200950, at *10-12.

The state court's denial of this claim was not an unreasonable application of Supreme Court authority.  There is no indication that the trial court's mentioning of the name of the person who would question the witness impermissibly suggested that this was the individual that the

witness should identify as the perpetrator.  Petitioner has failed to show that because he was identified as the person who would question the witness this somehow implicated him as the person who burglarized her house.

Even assuming that the trial court's statement was unduly suggestive, petitioner has failed to show that the totality of the circumstances surrounding the victim's observations of petitioner on the day of the crime made the in-court identification unreliable.  She observed petitioner commit the crime during daylight at a close distance.  The state court's denial was not unreasonable and this claim is denied.

## IV.     MOTION TO SUBSTITUTE COUNSEL

Petitioner next asserts that the trial court's denial of his second motion to substitute counsel led to his request for self-representation, both of which resulted in a violation of the Sixth Amendment.

### Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas.  *Bland v. Calif. Dep't of Corr.*, 20

United States District Court
Northern District of California

F.3d 1469, 1475 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc).  The Ninth Circuit has held that when a defendant voices a seemingly substantial complaint about counsel, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction.  *Bland* at 1475-76.  The inquiry need only be as comprehensive as the circumstances reasonably would permit, however.  *King v. Rowland*, 977 F.2d 1354, 1357 (9th Cir. 1992).

Regardless of whether the state court failed to rule on the motion to substitute counsel or denied the motion, the ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated.  *Schell*, 218 F.3d at 1024-25 (overruling earlier circuit precedent that had stated that habeas court's inquiry was whether the state court's denial of the motion was an abuse of discretion).  That is, the habeas court considers whether the trial court's denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  *Id*. at 1026.

### Background

On August 14, 2008, petitioner filed a motion to substitute counsel pursuant to *People v. Marsden*, 2 Cal. 3d 118 (1970).  Clerk's Transcript ("CT") at 92-100.  The trial court granted the motion and appointed new counsel.  *Id*. at 101-03.  Three months later, on November 13, 2008, petitioner filed a second *Marsden* motion seeking to relieve the newly appointed counsel.  *Id*. at 111.  However, petitioner withdrew the *Marsden* motion after a hearing.  *Id*.; ART at 9.  The next day, November 14, 2008, petitioner made a motion to represent himself pursuant to *Faretta v. California*, 422 U.S. 806 (1975).  ART at 3-5.  The trial court informed petitioner of the risks of representing himself and relieved counsel.  *Id*.  Petitioner later signed a written waiver and represented himself at trial.  CT at 306-07.

### Analysis

Petitioner argues he was denied the right to effective assistance of counsel because his first attorney was deficient and the replacement attorney had not been prepared for trial, leading

1   petitioner to the poor decision to represent himself when his second motion to substitute counsel

2   was denied.  He asserts that the lack of competent counsel, and the denial of his second *Marsden*

3   motion, violated his constitutional rights.  He also states that he did not withdraw the second

4   *Marsden* motion, rather the trial court denied the motion and this denial also violated his

5   constitutional rights.

6           This claim was raised in a state habeas petition with the Santa Cruz County Superior

7   Court.  Resp. Ex. 14.  The Superior Court denied the claim as procedurally defaulted and also

8   looked to the merits and found that petitioner failed to establish a prima facie case and that he

9   failed to demonstrate prejudice.  Pet. Ex. U.  The California Supreme Court summarily denied the

10  petition.  Pet. Ex. X.  Respondent argues that this claim should be denied as procedurally

11  defaulted.  Regardless, the Court will still look to the merits.  *Lambrix v. Singletary*, 520 U.S. 518,

12  524-25 (1997) (in the interests of judicial economy, federal courts may address an allegedly

13  defaulted habeas claim on the merits if the issue on the claim's merits is clear).[3]

14          To the extent petitioner argues he received ineffective assistance of counsel from the two

15  appointed attorneys, the claim is denied.  The trial court granted petitioner's first *Marsden* motion

16  and appointed him a new attorney.  Petitioner filed the second *Marsden* motion because his new

17  attorney filed a motion to continue to have more time to obtain an expert on identification for trial.

18  Pet. at 34.  Petitioner objected to the continuance so the attorney withdrew it.  *Id*.  Petitioner

19  argues that the attorney was not ready for trial and had not properly prepared.  Though, the

20  attorney had only been appointed a few months before and it was petitioner who objected to a

21  continuance.  Even if counsel had been deficient, petitioner has failed to demonstrate prejudice.

22  Petitioner's argument that he was prejudiced by representing himself is meritless because he was

23  informed of the risks of self-representation, he stated that he understood the risks, and he also

24  signed a waiver.[4]

25  _____

26  [3] The remaining three claims were raised in the same state habeas petitions and were also denied
    as procedurally defaulted and on the merits.  The Court will look to the merits of all of these
27  claims below.
    [4] There is no indication that petitioner's self-representation was inadequate.  Petitioner states that
28  he hired an investigator, called twenty witnesses to testify including an expert on witness
    identification and an expert criminologist.  Pet. at 40; CT at 298.

Petitioner also argues that the trial court erred in denying the second *Marsden* motion. While there is no transcript of the hearing, the trial court minutes indicate that petitioner withdrew the motion.  CT at 111.  The next day the trial court transcripts reflect the trial court stating that petitioner made a *Marsden* motion and then withdrew the motion, and petitioner was present and did not object to the characterization of the facts.  ART at 9.  Because the trial court did not deny the motion, there was no error.

Even assuming the trial court did deny the *Marsden* motion, petitioner is still not entitled to habeas relief.  The trial court had already granted a *Marsden* motion, three months prior, and did not err in denying the second *Marsden* motion, so soon after.  Petitioner argues that his attorney was not adequately prepared for trial, yet it was petitioner who objected to a continuance. A criminal defendant who cannot afford to retain counsel has no right to counsel of his own choosing.  *See Wheat v. United States*, 486 U.S. 153, 159 (1988).  Nor is he entitled to an attorney who likes and feels comfortable with him.  *See United States v. Schaff*, 948 F.2d 501, 505 (9th Cir. 1991).  The Sixth Amendment does not guarantee a "meaningful relationship" between an accused and his counsel; it only guarantees effective representation of counsel.  *Morris v. Slappy*, 461 U.S. 1, 14 (1983).  Petitioner has failed to demonstrate that assuming his second *Marsden* motion was denied, that the denial resulted in a violation of his rights.  For all these reasons petitioner has not shown a violation of the Sixth Amendment.

## V.   JUDICIAL BIAS

Petitioner contends that he was denied his right to a fair and impartial judge when the trial judge ruled adversely against petitioner regarding security procedures because the trial judge knew the prosecutor's husband.

### Legal Standard

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge.  *See In re Murchison*, 349 U.S. 133, 136 (1955).  A "biased decisionmaker [is] constitutionally unacceptable."  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct; rather, the

United States District Court
Northern District of California

1    question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to

2    violate federal due process under the United States Constitution."  *Duckett v. Godinez*, 67 F.3d

3    734, 740 (9th Cir. 1995).

4         A federal court must be convinced that a particular influence, "under a realistic appraisal of

5    psychological tendencies and human weakness," poses "such a risk of actual bias or prejudgment

6    that the practice must be forbidden if the guarantee of due process is to be adequately

7    implemented." *Withrow*, 421 U.S. at 47.  Federal habeas relief is therefore limited to those

8    instances where there is proof of actual bias, or of a possible temptation so severe that one might

9    presume an actual, substantial incentive to be biased.  *See Del Vecchio v. Ill. Dep't of Corr.*, 31

10   F.3d 1363, 1380 (7th Cir. 1994) (en banc).  Thus even where a judge had formerly served as a

11   prosecutor, made decisions in a prior case involving the defendant and subsequently ruled on the

12   admissibility of evidence concerning the prior case as a judge, habeas relief is unavailable absent a

13   showing of actual bias or of an actual, substantial incentive to be biased.  *See id.* at 1377-80.

14   Similarly, proof that there was contact between the judge and the prosecutor does not merit habeas

15   relief; only proof of an improper contact, e.g., an ex parte contact where the prosecutor is acting as

16   an advocate for the government, does merit relief.  *See McKenzie v. McCormick*, 27 F.3d 1415,

17   1419-20 (9th Cir. 1994) *overruled on other grounds*; *see also Greenway v. Schriro*, 653 F.3d 790,

18   806-07 (9th Cir. 2011)  (state trial court judge's "brief tangential employment relationship" with

19   member of victims' family found insufficient to raise a judicial bias claim).

20        **Background**

21        Because petitioner was representing himself, the trial court stated the following regarding

22   security procedures:

> What I have worked out with court security is the following:
> Because of the fact that you're going to need to be able to move
> around, because of the fact that you're going to need to be able to
> come [to] sidebar, we're going to have an extra bailiff posted, and
> that's the only additional shackle that we're going to have.

25   RT at 255.  The prosecutor asked if the bailiff would be present when they approached sidebar and

26   the trial court responded that it would be "taken care of."  RT at 256.  When the prosecutor asked

27   if petitioner would have his legs shackled, the trial court stated, "no."  *Id.*  Later, the prosecutor

28

stated:

> And I again am concerned for my safety.  He is a lifer.  If he's convicted of this, the least amount of time he could do is 40 years to life.  I know this Court knows that and a couple of witnesses from now, evidence being put on the stand, you know, tempers get flared; [petitioner] is not an attorney.  He's not an officer of the court.  He has chosen to represent himself.  This is not like every other case that we do around here.  Judge, I have concerns for my safety.

RT at 778-79.  Petitioner again objected to any procedure that highlighted his custodial status.  RT at 779.  To address the concerns of both parties, the trial court ruled that it would allow speaking objections during trial, and sidebar issues would take place outside the presence of the jury.  *Id.*

Once trial began, petitioner informed the trial court that the ruling regarding sidebars was no longer satisfactory.  He stated, "It's not working for me, Your Honor.  If she has to have a cop over my shoulder, I would rather have that and a sidebar than not be able to approach during cross-examination of a witness."  RT at 1019.  The trial court replied that it would honor petitioner's request.  *Id.*

Before the trial ended, petitioner filed a motion to dismiss based on prosecutorial misconduct.  CT at 363-66.  When a hearing was held on the motion, petitioner raised an additional ground regarding bias on the part of the trial judge.  The trial stated the following before petitioner's motion was heard:

> [O]n April 23, 2008, I testified pursuant to a subpoena in a state bar trial involving the husband of [the prosecutor].  I was under a subpoena.  And I gave testimony regarding legal work that he had done.  And I didn't bring this up because I didn't see it as an issue that affected my ability to be fair and impartial in this case whatsoever.  This case does not involve [the prosecutor's] husband.  He has no connection to it.
> However, after considering it overnight, I've decided to disclose it.  However, based on the statements that were made yesterday, I think [petitioner] stated that I've conducted this trial in a fair and professional manner.  But I decided to disclose it.  Apparently – now, is there something you wish to state with respect to that?

RT at 1503.

Petitioner read into the record the state bar decision which stated in part, "[t]wo judges of the Santa Cruz County Superior Court credibly testified as to Respondent's good character and superior legal abilities."  RT at 1504.  Petitioner argued the he should have been notified that the trial judge was one of the judges.  RT at 1505.  The trial judge responded that he testified pursuant

1  to a subpoena regarding the prosecutor's husband, and that it had no bearing on his ability to be

2  fair and impartial during the trial.  RT at 1506.  Petitioner argues that the trial judge's bias was

3  demonstrated in his ruling on the security issues based on the judge's knowledge of the

4  prosecutor's husband.

5        **Analysis**

6        Petitioner has not shown that his trial was rendered so fundamentally unfair as to violate

7  federal due process.  Even if the trial judge was biased based on testifying pursuant to a subpoena

8  at the prosecutor's husband's hearing, petitioner has not shown how the trial judge ruled against

9  him or conducted the trial in a biased manner.   The only example he offers is the ruling regarding

10  the security arrangement for trial.  Yet, to avoid the jury seeing a bailiff follow petitioner around

11  the courtroom during trial, the judge stated sidebars would occur outside the presence of the jury

12  and the parties would remain seated.  The trial judge also did not force petitioner to be shackled.

13  It was only when petitioner objected to the sidebar practice and stated he would prefer the

14  presence of a bailiff at sidebars, did the judge enact the bailiff procedure.  Petitioner has not shown

15  any improper conduct, let alone bias that was so pervasive that it resulted in an unfair trial.  This

16  claim is denied.

17  **VI.**    **INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

18        Petitioner alleges that appellate counsel was ineffective for failing to obtain the transcripts

19  from the second *Marsden* hearing and failing to raise claims of *Marsden* error, judicial bias, and

20  cumulative error.

21        **Legal Standard**

22        The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

23  effective assistance of counsel on his first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 391-

24  405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the

25  standard set out in *Strickland.  See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v.

26  Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010*); Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

27  The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so

28  undermined the proper functioning of the adversarial process that the trial cannot be relied upon as

United States District Court
Northern District of California

1    having produced a just result.  *Strickland,* at 686.

2           **Analysis**

3           The Court has already found that the claims involving the *Marsden* error and judicial bias

4    lacked merit; therefore, appellate counsel was not ineffective for failing to raise them.  As will be

5    discussed below, the claim of cumulative error is also meritless.  Nor is petitioner entitled to relief

6    for appellate counsel failing to obtain the transcripts of the *Marsden* hearing.  Petitioner includes a

7    letter from appellate counsel who states that perhaps he should have requested the transcripts, but

8    the standard for gaining a reversal on a denial of a *Marsden* motion is very difficult and, "it never

9    occurred to me to connect the *Faretta* and the *Marsden*, and consider that you ended up

10   representing yourself because your attorney's work was so substandard, rather than because you

11   decided that you wanted to represent yourself."  Pet. at 77-79.

12          Even assuming that appellate counsel was deficient for failing to obtain the transcripts,

13   petitioner has failed to show prejudice.  Petitioner has not described what occurred in the *Marsden*

14   hearing that would support his claim, assuming that the trial court minutes and transcripts from the

15   following day that reflect petitioner withdrew the *Marsden* motion are incorrect.  His conclusory

16   argument that the transcripts would provide habeas relief is insufficient.  *See James v. Borg*, 24

17   F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of

18   specific facts do not warrant habeas relief.")  This claim is denied.

19   **VII.    CUMULATIVE ERROR**

20          Petitioner contends that the cumulative error arising from the *Marsden*, judicial bias and

21   ineffective assistance of appellate counsel claims entitles him to habeas relief.

22          **Legal Standard**

23          In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

24   the cumulative effect of several errors may still prejudice a defendant so much that his conviction

25   must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing

26   conviction where multiple constitutional errors hindered defendant's efforts to challenge every

27   important element of proof offered by prosecution).

28          Cumulative error is more likely to be found prejudicial when the government's case is

United States District Court
Northern District of California

weak.  *See*, e.g., *Thomas v. Hubbard*, 273 F.3d 1164, 1179-80 (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See Hayes v. Ayer*s, 632 F.3d 500, 524 (9th Cir. 2011).  Similarly, there can be no cumulative error when there has not been more than one error.  *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

### Analysis

This Court has not found any constitutional errors let alone multiple errors that cumulatively would allow for reversal.  *See Hayes*, 632 F.3d at 524.  Moreover, there was overwhelming evidence implicating petitioner in the burglary of the victim's residence.  This claim is denied.

## VIII.   CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id*. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED**.

Dated: July 29, 2015

_____

JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT SOTO MARQUEZ,<br><br>      Plaintiff,<br><br>    v.<br><br>H LACKNER,<br><br>      Defendant. | Case No.  13-cv-02525-JD<br><br>**CERTIFICATE OF SERVICE** |

      I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

      That on July 29, 2015, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Vincent Soto Marquez
H-31079
5150 Obyrnes Ferry Rd
Jamestown, CA 95327

Dated: July 29, 2015

Richard W. Wieking
Clerk, United States District Court

By:_____
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO